All right, we'll take our first case of the day, In Re Exide Technologies, and thank you for bearing with us. May it please the court, I am Douglas Candube of Morris James LLP. On behalf of the appellants, the five Dunlop Holdings, or PDH entities, PDH USA, PDH Europe, PDH Singapore, PDH International, and PDH Hong Kong. You've now used half your time. No, I'm just kidding. Would you raise the microphone, please? Do you want rebuttal time? I would reserve three minutes for rebuttal, thank you. I'll refer to the four that are not PDH USA as the PDH foreign entities. In a pre-bankruptcy state court, state law-based lawsuit, the PDH foreign entities asserted causes of action against the three non-debtor foreign subsidiaries of the now reorganized debtor Exide Technologies, formerly Exide Corporation. When Exide filed for bankruptcy relief, some of its domestic subsidiaries also jointly filed for bankruptcy, but Exide elected to protect these foreign subsidiaries and their assets from the bankruptcy process, and they remained non-debtors. Although Exide kept these foreign entities out of bankruptcy, Exide has followed a strategic route of abusing the bankruptcy process to improperly insulate the foreign defendants from the PDH foreign entities' claims against them. Unfortunately, the lower courts have misguidedly and erroneously enabled Exide in doing so, and that's why we're here. We're here because, in various ways laid out in our briefs, the lower courts have exceeded their authority and overridden the statutory and constitutional rights of the four PDH foreign entities in pursuing their state court state law claims for breach of contract, unjust enrichment, and conversion. But didn't the bankruptcy court have to decide the extent of the liability of Exide the debtor for the claims of PDH? Absolutely not. That's a merits decision. The question before the court was only a motion for remand or abstention, and it's not proper for a court to decide the merits of anything on a procedural motion for remand or abstention. But the court, if the liability was solely the liability of Exide, doesn't that impact on whether the case should be remanded to a state court? Because if against Exide, then only the bankruptcy court would have jurisdiction. Isn't that correct? If the liability was strictly Exide's liability and Exide is the debtor, then would the court not have erred and send it back and remand it? No, Your Honor, because there is no question, there's no dispute that the coordinating agreement provided for bringing lawsuits against all the parties. And so the only issue was indemnification. If you see Section 4.5, it talks about suits against the other party and their affiliates. So there's no question about suits being able to be pursued. So then the only issue is, and under Halper versus Halper, the court's supposed to do a claim-by-claim analysis. It's very simple. You look at the claims. The state court claims are conversion, which doesn't even necessarily get covered by the agreement, which was something that was alluded to in the remand motion that the court said, we're going to keep all the claims. But the conversion, adjusted risk and contract, and you look at those claims, and those are state law pre-petition. They don't arise under Title 11, obviously, because they're state law. They didn't arise in the case because they existed before the case. All right, but you filed proofs of claim. Yes. Whether they are characterized as conditional or contingent or whatever modifier you may choose to use, they are still proofs of claim that in and of themselves could give rise to a determination of court jurisdiction here. Your Honor, if I may hold that, because I want to finish the answer to Judge Randell's question. I'm sorry. I didn't realize you had it. The point I was getting to next was that as to the point that they raise about the indemnity obligations, if you get there at all, it only relates to whether this is unrelated completely or related to the courts. All right. Let me jump in there then, and we can get back to my court jurisdiction question. Your primary issue in your brief is of constitutional dimension, something that we don't see in every bankruptcy case. You argue that summary judgment was not only improvidently granted, that it was a violation of due process. That's right. And you just mentioned abstention. I don't understand why you've ratcheted this up to an issue of constitutional proportions. Why aren't you just arguing that mandatory abstention should have applied here and the bankruptcy court never should have reached the issue of construction or interpretation of the agreement? Well, we do argue that, Your Honor. You didn't really argue mandatory abstention. Oh, absolutely. Section 1334C-2 all the way through the lower court and then the district court and again here. I'm not sure I follow you, Your Honor. You're frowning, but it was raised at every level. To follow up the questions that you have pending, is it really the crux of this case that takes you to the question of mandatory abstention is whether these claims are core or non-core? Isn't that really the crux of this dispute? That's the crux of the mandatory. You get to that very late in your brief. I apologize if the order of the brief was suggested any. It seems to me that you need to convince us that this is a non-core matter. Well, Your Honor, it's clearly. If it's related to mandatory abstention, then it should have been adhered to by the bankruptcy. That's right. That's right, Your Honor. And the case law is really clear. Under Section 1334C-2, if you have a state case that was removed to federal court, the only basis is bankruptcy jurisdiction, and it can be timely adjudicated, and it's related to but not arising and arising under, you send it back. And this didn't arise under Title 11. It's clear. It didn't arise in a bankruptcy case because it is preexisted. The only issue, then, under this Court's clear case law from PAYCORP v. Higgins and Federal Mogul and Combustion Engineering is if there's some indemnification issue, then if it's common law indemnity, it's not even related to under PAYCORP, and then if it's a written agreement or guarantee, then it could be related to. That's what the courts have held. Your Honors, this Court has held. Who should construe the coordinating agreement? Your Honor, the only question was whether or not there was a ‑‑ if the Court found that there was a written agreement for indemnity or that there could have been, then it's still related to. It doesn't matter because it's not core. All right. That's not my question. Let's assume that Judge Carey had said, oh, guess what, mandatory extension because we've got three third parties for suing non‑debtors, I mean directly suing non‑debtors. So I really should abstain from this. When and how does the issue of the meaning of the coordinating agreement get considered? The coordinating agreement gets ‑‑ Well, let's say we say the Court was wrong. If it's mandatory abstention, it gets sent back to the State Court. All right. And then does the Court, in the absence of Exide, decide that Exide alone is strictly, is the one totally liable for this? Or does the case get thrown out because of lack of indispensable party at that point? That would be for the State Court to decide. That was the motion that was pending. But the Court can potentially find, ultimately, when the case is developed, either that there is no liability for other reasons against the Exide foreign defendants or there is liability but we can't collect from them. And then if that's the case, which is what you're saying, because it's indemnification by the other party, then we go back to our ‑‑ that brings us back to the proofs of claim because the proofs of claim are only contingent liabilities. All right. Let me back up. Where is this going? Let's assume we said Judge Kerry was wrong and Judge Robinson was wrong and it shouldn't have been decided. Either it shouldn't have been decided in the context of a remand or it was wrongly decided and you get to go back ‑‑ do you get to go back to Illinois State Court? Yes, Your Honor. And absolutely. And then ‑‑ And we, Your Honor, don't forget this is the argument we started with, as Judge Fischer pointed out, the suspended summary judgment. The point is we never got to argue the merits. We got a decision ‑‑ Excuse me. The merits of what? The merits of the ‑‑ Because there was extensive argument regarding that agreement at the November 19th hearing. Was there not? Your Honor, we had no opportunity to brief the issue at all in advance. The judge had already made up his mind. We were there. Did you object? I read the transcript for that hearing. My recollection is there was extensive discussion and argument of the agreement and that there was no objection. Your Honor, we shouldn't go there. Your Honor, frankly, at a hearing when you're suddenly foisted with a judge's questions, it's sometimes ‑‑ So the answer is no, there was no objection. It's sometimes difficult to say, Your Honor, you shouldn't go there. We're not that scared. But we didn't ‑‑ Wait. Let me ask you this. Was there any ‑‑ But we brought that up in the motion for reconsideration. Let me ask this question. Was there any request to supplement after that hearing by filing something in addition to what was argued? Your Honor, within the 10‑day limit, we filed a motion for reconsideration because we felt we were ambushed. And the judge recognized that in the hearing that followed when he said to the other side, Exide's counsel, what do you think about their argument that they were ambushed? I'm surprised that you're not asserting, maybe you are, waiver on the part of the Exide entities.  You noted that there was no defense asserted and they didn't raise the argument in the case against the non‑debtor Exide. But I'm surprised you're not pushing that very, I think, interesting argument that in state court they filed a motion to dismiss, never said the non‑Exide entities never said we shouldn't be here. Well, that's right. Exide's solely liable. They filed an answer that never said we shouldn't be here. Judge Carey didn't even have the files from Illinois State Court until two months after the argument. That's right, Your Honor. Are you addressing that issue before us, that it was too late in the bankruptcy court for them to be raising it? Well, Your Honor, if nothing else, that would at least be grounds for minimally finding the agreement to be ambiguous on this point, considering they never raised it in their answer and they didn't raise it in their first motion to dismiss. Well, I don't think the failure to raise introduces an issue of ambiguity. Well, it suggests that they didn't think of it in the first place, so maybe it would be a waiver. I would think you would be saying not only they didn't think of it, they knew that that wasn't what the agreement said. Right. And, Your Honor, we actually, the point was made that this had been decided, in effect, by Judge Gardner when he allowed the state to go forward. We made that point. There was, on the other hand, a substantive motion that was pending that was not re-raised by Exide in the bankruptcy court, and that was where this issue would have been dealt with seriously. We were not prepared to, contrary to what Judge Smith described from the argument, we had not briefed this issue. We didn't have a chance to develop our facts and to develop our arguments and to develop also the defenses of potentially a mutual mistake, the fact that the conversion claim isn't even affected by that argument, and so on. All of these things we didn't have a chance to develop. All right. We will give you a chance. May I just follow up on my one question that was never answered, and that is with respect to the proofs of claim. The proofs of claim, Your Honor, thank you, are not identical to the state court complaint. The PDHUSA had multiple claims which were not even encompassed in just the two complaints, and as to the four entities, they are also not identical. They attach it, but they are not identical because they are contingent on whatever the claim is only in the event we can't collect, then we should be able to collect from Exide. And beside that, Your Honor, the bankruptcy court himself in the motion reconsideration did not believe that claims allowance was the basis for his jurisdiction. He only cited 157B to A and G and O and not B and C, contrary to the initial order. And furthermore, in the cases of Holiday RV Superstores and CIT Communications and the resource technologies and Davis v. McGriffin, in all these cases, proofs of claim don't if you're talking about a claim against a non-debtor. If we agree with you on the core versus non-core issue, on the mandatory abstention question, doesn't this at least have to go back to the district court to determine whether or not the Illinois state court can timely adjudicate the matter there to entitle you to mandatory abstention? Your Honor, we believe that the evidence and the record is sufficient for this court to in the transcripts about how he would want to move this along. This was in a commercial docket. This court in Stowe v. Flaherty. What is the evidence in the record of timeliness before the state court? Well, the court was pushing along in the transcripts. You see Judge Gardner pushing along the case, wants to get it moving, and it was on a commercial docket, which was designed to move along commercial cases. Obviously relative to Stowe v. Flaherty sets the standard, which says it's relative to the needs of the bankruptcy case. In this case, we have a confirmed plan where the case is set for years in bankruptcy court, so there's no rush on the bankruptcy court side. Clearly, this could have been disposed of long ago had it been sent back to state court. Okay. All right. Further? All right. We'll hear from you on rebuttal. Thank you. Thank you very much. Good morning, Your Honors. May it please the court. Ben Chiu, Andrew Zimitty, and Jamie O'Neill for Eppley Exide Technologies. PDH's contention that the bankruptcy court somehow reached beyond its jurisdiction to decide the former PDH entities' pre-petition claims versus Exide non-debtor entities fails because it improperly assumes that they had viable claims against the Exide non-debtor entities to begin with. To the contrary — Well, Your Honor, we respectfully disagree with that. If Your Honor would look at the sixth affirmative defense, it reads, quote, So we respectfully submit that, in fact, that defense was asserted as an — Well, but you said it with respect to the types of breaches, not that the entities didn't cross-claim over against Exide, saying only Exide was liable, did they? That is true, Your Honor. But we believe that the language of the sixth affirmative defense is broad enough to include that. We also would respectfully submit that that was not required to be asserted as an affirmative defense because it's a contract-based defense. Finally, Your Honor, if Your Honor — Is that Illinois law? We believe that is Illinois law, Your Honor. I don't have a citation for the court. But we also would respectfully submit, Your Honor, there is a counterclaim set forth in the record as A-1925-1927, where Exide specifically counterclaimed for breach by PDH of the exclusive remedy provisions, the very provisions of the coordinating agreement that we're talking about, the provisions that Judge Carey had to resolve, as Your Honor pointed out. In reaching the extension issue, he, per force, had to decide whether there was core jurisdiction, which in turn brought him back to the language of 4.2. What about the fairness of this hearing? Judge Carey really, at the outset of the hearing, said — made conclusions that he later reiterated. But the hearing really took off on a different tack from the concept of remand. And you yourself said at the hearing, we had no idea, and we have this in writing, by the way, our understanding of the proffer that would be opining or presuming to opine about the meaning of 4.2, the coordinating agreement, and that would be unfair surprise at a very minimum, Your Honor. We didn't understand that it was to be an evidentiary hearing on the issue of the meaning of 4.2. We've argued it's unambiguous to the extent the Court disagrees. We believe the next appropriate step would be to set up a discovery period here in this Court and then an evidentiary hearing. So aren't you yourself noting to the Court that the Court is taking this matter and running with it in a direction that just wasn't anticipated? With all due respect, Your Honor, no. I've never been accused of being overly articulate. But what I was trying to convey was — This is like what I really meant to say or what I said? What I meant to say, and artfully perhaps, is the unfairness at the hearing or what we thought was PDH's counsel had proffered the testimony of trial counsel in Illinois. Ms. Wolfe was there. He said she's here. She's ready to tell you what Section 4.2 and Amendment No. — Counsel, please don't shake your head at the counsel table. I'm sorry. Go ahead. The unfairness that I was referring to, Your Honor, was PDH's counsel brought with him to the hearing Ms. Wolfe, who had been the trial counsel below, and he proffered her to Judge Carey as a witness to explain what Section 4.2 meant and what Amendment No. 1 meant. We thought that was unfair. We continue to believe it would have been unfair to put her on as we had no notice that that was going to occur. We were on very strict notice that, in fact, the issue of 4.2 was relevant because PDH had raised that very issue in briefing before Judge Sonderby in the Illinois Bankruptcy Court, and it was alluded to in the briefing. We briefed the issue in our brief, in our opposition brief. PDH is correct that it did not have under the bankruptcy rules an opportunity to reply, but it certainly could have moved for leave to reply. And even had we opposed it, my guess is that, in fairness, Judge Carey, who, as I believe it was Judge Smith, and I apologize to Judge Fischer if I'm incorrect, allowed an awful lot of briefing in that case. And not only did, of course the position, I believe, of your adversary, is that the local rule only provided for certain steps of briefs, but the point you're making is there certainly could have been a motion to file a reply brief, and there wasn't. Yes, Your Honor, and there are several courts. We have a defamation case now in federal court in Boston where that's the rule, and both sides have routinely filed motions for leave to file a reply, and in every instance they have been granted. So the unfairness, Your Honor, to what I was referring to was the live testimony. And as Your Honor knows from the transcript, Judge Carey determined that the testimony was not necessary. Well, beyond whether there was fairness or unfairness, surely there was a serious question as to whether or not the parole evidence rule ever would have permitted such testimony in the first place. Absolutely, Your Honor, and Judge Carey twice decided and Chief Judge Robinson affirmed that this language is clear as a bell, and any ambiguity that might have arguably been set forth in 4.2 was removed by Amendment 1, which showed that the parties clearly understood that when they wanted to add international buyer, i.e., the Exide non-denner entities, they knew how to do it. Except in the other subsections of the agreement, it talks about the stock purchase agreement, clearly anticipating that you're talking about all of the entities' stock purchase agreements versus all of the others. To my mind, I have great difficulty in finding a lack of ambiguity based upon that amendment. How do those other subsections then get read? Are they exclusively Exide and one stock purchase agreement, and there's absolutely no reference to the other PDH entity stock purchase agreements against the other Exide entities? That doesn't make sense, does it? No, it doesn't, Your Honor, and we're not relying on the mere formality that the coordinating agreement itself is just between Exide Corporation and PDH USA. No, but Judge Kerry specifically said, aha, Amendment 1, as did Judge Robinson. And Amendment 1, just reading it that way, doesn't make sense when you go down to the other subsections, does it? Well, we respectfully disagree. We do believe that it does make sense, and we do believe that the only way, I think as Judge Kerry said, the only way, had there been any ambiguity, it was removed by. I know he said that, but how do you then read sub B, sub C of that section? All right, we've got little i. All right, then we've got two little i talking about buyer contained in the sale agreements in each case without regard. Buyer in the sale agreements, doesn't that have to mean buyer and the other international buyers in the sale agreements? Tell me how you read it. Your Honor, we don't read it that way. I think buyer and international buyer are used, I think when the parties wanted to distinguish, they did. Well, let's look at two little i. Was Exide party to one sale agreement? Exide itself, the debtor. I believe there were a number of agreements, Your Honor. All right. I'm just looking at the definition of sale agreements, which isn't there. All right. I have trouble, Mr. Chu, I have trouble finding how this can be a core matter. I know that you're arguing that the indemnification makes it a core matter, but if I'm not convinced by your indemnification argument, what else is there to convince me that it's a core matter? Well, Your Honor, there are several bases upon which we believe that both Judge Kerry and Chief Judge Robinson found that this was a core matter. The first, of course, I think as the Court has alluded to this morning, were the four proofs of claim. The second is, and Your Honor has referred to it, and if it's not convinced this is not one of the bases upon which it will affirm, is the indemnification language. And the third are the finding by Judge Kerry that the claims against non-debtor entities were inextricably intertwined with those against Exide. And we can go through those. Doesn't that mean related to? That's a more apt way of putting it, Your Honor. But I believe that the. . . Doesn't that make it non-core? No, Your Honor. I think the cases speak in terms of inextricably connected, and that's what the Court found. So I don't want to misstate what the Court said or what we're relying on. I think there's just one case. Is there any case other than the RBSC case, RSVGC, that talks about inextricably linked? Your Honor, that's the case that we've relied on. That's the one that we're aware of. And we believe that the Travelers case is particularly apt in this case. How do you get away from Halper, which is our authority? I mean, there's a lot of cases being cited from the Northern District of wherever, and yet we have authority here in the Third Circuit under Halper that you look at these one by one. And we have lawsuits brought by third parties with claims specifically against non-debtors. And if that claim of Hong Kong PDH is brought against Hong Kong Exide, tell me how that claim gets litigated in bankruptcy court. Well, Your Honor, again, we believe that by virtue of filing the proofs of claim, that they've consented irrevocably to the jurisdiction of the bankruptcy court. And PDH entities say it's not the same claim as which were claims which were the subjects of the state court action. They say so, Your Honor, but attached to the proofs of claim were the complaint in the underlying action. So their actions belied what they're saying now. The complaint was attached, incorporated by reference to the proofs of claim. So I don't know how they can say that with the state court. If there's an antitrust case filed against 50 entities, and Exide's one of them, and someone files a one other of the defendants filed proofs of claim in the Exide bankruptcy just in case there's a claim for contribution or indemnity, are you saying that antitrust claim becomes a core matter in the bankruptcy? I don't know, Your Honor, but I don't think that was the situation that was presented before Judge Kerry and Chief Judge Robinson. I think what they were facing were contract-based claims. And there was a conversion claim, and PDH would like to make a great deal of that and say, well, gee, this is a conversion claim. It's totally different. Even assuming Judge Kerry and Chief Judge Robinson were correct, as to the contract-based claims, we've got this conversion claim out there. The problem with that argument is that the conversion claim also is contract-based, and it arises out of the same factual predicate. So we don't think that gets them where they want to be. But are you talking really about the fact that proof of claim in and of itself has submitted themselves to the jurisdiction? You're not saying that if the proof of claim is based upon contract versus antitrust or something else, that that really matters, are you? Well, no, Your Honor, but if I'm understanding the court's hypothetical, and I may be obtuse in not understanding it, I don't think that that's what the court was looking at in this case. The proof of claim could not have been clearer, could it, that this is merely to address the eventuality that someone disagrees with them as to the nature of the liability? Well, that is true. But, again, we would go back to the Traveler's case, which is very clear that whatever kind of precatory language parties try to put in, it is not given the effect that PDH would have this court give it. But isn't the Traveler's case a preference case? Isn't that a different case than what we have here? It did involve preferences, Your Honor, but we do believe it is on point and does apply here. Okay. Could you tell us what the provision in the plan that said there's no discharge of the claim for the PDH entities against the non-debtor Exide entities, what did that mean in the plan? Your Honor, I don't know with that specific language. The other thing that's curious is in the red brief, you argue that the Bankruptcy Court didn't disallow the claims of the foreign entities. You said it only denied the remand. Is it your contention that these claims still are alive and well in Illinois? No, Your Honor. I mean, our contention, and they are, alive in the context of the Bankruptcy Court. Well, I don't know what you mean at the red brief. They haven't been adjudicated upon. On page 16, you say the Bankruptcy Court didn't disallow the claims of the foreign entities. Well, that's correct, Your Honor. The proofs of claim are pending. The proofs of claim are pending. Was any distribution made on account of the proofs of claim? Not yet, Your Honor. We're still very little, as PDH's own counsel referred to in the briefs, virtually nothing has happened for five years. These have been – But the plan has been confirmed, correct? That is correct, Your Honor. And what was the provision for payment of creditors under the plan? Well, the provisions, Your Honor, were – these have not been paid, if that is Your Honor's question. They've yet to be adjudicated. Okay. So have they been objected to? No, Your Honor. They have not been. And can they be objected to? If they're not objected to, aren't they allowed? The deadline has been extended frequently. The deadline has not passed for objection. For objection to claims? Correct. What are the total amount of claims in the proceeding at Excise Bankers? I believe the total is $20 million for the adding up, aggregating the proofs of claim. These would be an additional $8 million, correct? That's correct, Your Honor. That's part of the $20. That's part of the $20? Part of the $20. Yes, Your Honor. Well, then are these – do these make up the total claims in the proceeding? Is this what the proceeding is all about, these claims? What's at issue are the $8 million of the $20. All right. But what's the total amount of claims that the PDH entities have? $20 million is my understanding. And that's the total proceeding, is these? That is my understanding. Well, you could clarify in a letter if you would. I have a nod. I can give the Court the precise figure, but I believe it's $20 million. Thank you, Your Honor. Thank you. Your Honor, thank you. It's not $8 million. There is confusion about that. This is actually clarified in our briefs at footnote 4 and in text related to that. Footnote 4 of your blue brief? Yes. The total in the state court complaint that's at issue was about $16.5 million and about $9.8 million – not $8 million, but $9.8 million was the PDH foreign entities' claims. The reason that they had this $8 million – Against the Exide foreign entities. Against the Exide foreign entities. That's right, Your Honor. And the rest of it, the smaller part, the $6.7 million, was Exide. The reason that there's $20 million is because there's a bunch of claims additionally from Exide against – from PDH USA against Exide, which are not at issue here, and that's where you get up to the $20 million. The $16.5 million is just the state court complaint, and out of that $9.7 million is the four PDH foreign entities, and the reason they said $8 million is because they excluded one of those entities. They only counted three out of the four. I also don't want to miss the point. Going back to Judge Fischer's question about court-on-court, we are also arguing a forum selection clause, and I want to alert the Court to a recent case that was well thought out from the District Court of Colorado in March of this year, D.E. Frey, that's F-R-E-Y group. There's a Bankruptcy Reporter site coming, but for now it's 2008 W.L. 630044. In that case, forum selection clauses were enforced even in a court proceeding, which this is not. There was only one sale agreement between Exide and PDH USA. Linda Wolf was not there as a witness to explain anything about Section 4.2. She was offered to provide background on the litigation and the contract generally, but she was not a drafter, and she was certainly not about to testify factually about the intent of the parties because she wasn't involved in that process. It was just to provide background. Now, did you ask Judge Carey when you realized what this was going to develop into to permit her to testify or to permit someone to testify? From the outset, I offered her as a witness to just explain the background when I introduced myself, but that was before Mr. Chu even jumped in, and that was just to provide background on the litigation because the litigation is complicated enough by itself with all the history of the actions, the two different lawsuits, and the remand and the transfer. So that was really just to provide the background. Given the statement in the plan that there is no discharge of these claims, what do you take that to mean, and did you then go back to Illinois to try to pursue them? Well, Your Honor, that's one of the issues. And just for point of clarification, it's actually in the confirmation order. That's where that language appears, but it applies to the plan and limits it, and our belief is that that meant that we are entitled to except that we need a court to say so because that stay doesn't apply and there's no discharge and we ought to be able to proceed, but we need to get this lawsuit back there to do that. I think I've used my three minutes. Thank you very much. Thank you, Your Honor. All right, we'll take the case under advisement.